**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**AT KNOXVILLE**

| | | |
|---|---|---|
| **DG SMOKY, LLC and** | | |
| **WINGSPAN RENTAL, LLC** | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | **JURY DEMAND** |
| v. | ) | No. 3:24-cv-00364 |
| | ) | |
| **AUNT BUG'S CABIN RENTALS, LLC,** | ) | |
| **BRIAN SPIEZIO and SHAWN SPIEZIO,** | ) | |
| **MIGHTY PEAKS REALTY, LLC** | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF ITS MOTION FOR
DECLARATORY JUDGMENT AND PRELIMINARY INJUNCTION AND/OR
<u>TEMPORARY RESTRAINING ORDER</u>**

Plaintiffs DG Smoky, LLC and Wingspan Rental, LLC (collectively, "Plaintiff") by and

through counsel, submit this memorandum of law in support of its Motion for Declaratory

Judgment and Preliminary Injunction and/or Temporary Restraining Order.

**I.    Introduction**

Plaintiff is forced to seek immediate judicial intervention due to the unlawful and unethical

actions of the Defendants who have outright stolen $77,549.28 from the Plaintiff's trust accounts.

This theft of trust money has been executed without any legal right, authorization, or justification,

and the Plaintiff has reason to believe these illegal withdrawals will continue unless Court

intervention steps in to halt this misconduct.

Defendants manage multiple vacation rental properties owned by Plaintiff. Defendants

have unilaterally and falsely declared Plaintiff in breach of the property management agreements.

Defendants have gone as far as to document their theft on Plaintiff's monthly owner statements –

labeling it as "Breach Contract Damages Owed $140,137."

Additionally, Defendants are solely in control of Plaintiff's properties and handle the bookings. Plaintiff is rightly concerned about the Defendants' potential damage to the properties, disruption of the booking income, and tarnishing of the reputations of the properties in the short-term rental market. Good reviews drive bookings and bad review deter them. Plaintiff is left with no choice but to seek declaratory relief and/or a preliminary injunction to put an immediate stop to Defendants' actions. Defendants' conduct has escalated beyond a mere contractual dispute.

Plaintiff will seek a judicial declaration that the contract provisions being used by Defendants to justify their actions are illegal and unenforceable. Plaintiff will further request the Court to require Defendant to return all of the stolen funds to Plaintiff's trust account; to prevent Defendants from withdrawing funds from Plaintiff's trust account in the future in violation of Tennessee statutes; to require Defendants to immediately provide an accounting and reconciliation of all finances; the restoration of control over Plaintiff's properties to be returned to Plaintiff; and any other relief the Court deems appropriate. Alternatively, Plaintiff requests from the Court permission to retake possession of their properties because Defendants have committed the first material breach of the agreements.

## II.    Facts

### *The Parties*

Plaintiff owns several properties in Tennessee ("Properties"). Plaintiff rents the Properties to other persons and/or companies for rentals, short-term rentals, event rentals, and other private purposes. Defendant Aunt Bug's Cabin Rentals, LLC ("AB") is a Tennessee-licensed Vacation Lodging Service Firm.

Upon information and belief, Shawn Spiezio is the President of AB, and Brian Spiezio is the Chief Operating Officer of AB. Shawn Spiezio is a Tennessee licensed real estate broker and

the principal real estate broker for the real estate firm Mighty Peaks Realty, LLC ("Mighty Peaks"). Brian Spiezio is an affiliate real estate broker for Mighty Peaks. All Defendants are subject to the rules and regulations of the Tennessee Real Estate Commission, Real Estate Broker Act, and Vacation Lodging Services statutes.

### *The Agreements*

In September and October of 2022, Plaintiff entered into two separate management agreements ("Agreements") with AB for the management of each property owned by Plaintiff. Although each Agreement contains a different start and end date, the Agreements contain similar, if not identical, provisions. A true and accurate copy of each Agreement is attached to the Complaint as **Exhibits A and B**.

The Agreements contain, among other clauses, a termination date of December 31, 2030, unless canceled after a 24-month term with 90-day notice. The Agreements also contain a "Promotion" section where the Plaintiffed select a promotion package that would extend the Minimum Term in exchange for waiving certain fees.

Further, the Agreements contain a provision stating that "Promotions below require Sale of cabin be handled by Co-owned Mighty Peaks Realty, while also retaining new Buyer on the rental program for the remainder of Seller's contractual term (no less than twelve months) upon the sale."

The Agreements also contain a mediation provision stating "[a]ny breach in contract or early termination that could not be resolved between Company and Owner may result in legal mediation that would be subsidized by party that cancels said contract."

### *AB and Mighty Peaks' False Projections and Misrepresentations*

Before purchasing the Properties, Plaintiff had discussions with the Spiezios regarding the potential rental income that Plaintiff could receive as owners of the Properties, specifically through AB's property management services. During these discussions, AB provided inflated and false income projections with the intent of fraudulently inducing DG into purchasing the properties and signing the Agreements.

Relying on the expertise of Mighty Peaks, and particularly agent Brian Spiezio, due to his relationship with AB and AB's experience in the market, the Plaintiff trusted the accuracy of the rental value estimates for the properties they were considering purchasing.

Prior to finalizing the purchase in 2022, the Plaintiff received written projections from AB outlining expected gross rental values, which are attached to the Complaint as **Exhibit D**. These figures were also provided to the lending bank that also relied on these numbers to approve and provide loans to Plaintiff. However, these projections provided by Defendants were deliberately misleading and inaccurate.

Despite having access to correct information, Brian Spiezio provided figures that were far from realistic. When the actual revenue for 2023 came in, it was significantly lower than expected, falling short of the projected numbers by 20-65% across the various properties.

It wasn't until after the purchase, and several months of AB's management, that the Plaintiff realized the projections had been blatantly false from the outset. AB not only failed to meet the income estimates but also underperformed on every level. Trusting Mighty Peaks and Brian Spiezio's market expertise, and based on their partnership with AB, Plaintiff had believed and trusted Defendants' ability to provide accurate estimates. To date, neither AB nor anyone else has provided any evidence of market factors that could explain the vast shortfall in income or justify the projections being so far off.

For example, On August 7, 2023, AB consented to release DG and Fiddlers Creek from the DG Property Agreement and allowed DG to self-manage the Fiddlers Creek property. The transition was amicable. Immediately after DG assumed management of Fiddlers Creek, DG noticed a substantial increase in income and performance.

### *AB's Continued Deficient Property Management Services*

In 2024, frustrated by the poor performance of the properties under AB's management, the Plaintiff again initiated discussions with the Defendants to address their concerns. As the properties were not meeting the income projections AB had promised, the Plaintiff became increasingly worried about defaulting on their loans.

A phone conversation between the Plaintiff and Shawn Spiezio took place, during which Spiezio gave the Plaintiff the impression that AB would be open to a resolution similar to the one reached for Fiddler's Creek, where certain properties would be released back to DG by mutual agreement. At Shawn Spiezio's request, the Plaintiff complied by summarizing their concerns and requests in a detailed email.

AB failed to respond to the summary via email or phone as Plaintiff expected. Instead, on February 2, 2024, AB, through counsel, sent a letter alleging that the Plaintiff was now in breach of the Agreements. AB's position was that this breach entitled them to claim the "full benefit it would have received under the Agreements' complete three-year terms." Further, the attorney's letter asserted that because the Plaintiff had participated in certain promotions, the term of the agreements had automatically extended to three years. AB argued that if the agreements were terminated prematurely, the Plaintiff was obligated to reimburse AB for the full value of the promotions.

According to AB, the lost rental commissions for the remainder of the three-year terms totaled over $270,000, with an additional $108,000 in booking fees, leading them to claim $378,000 in lost commissions and consequential damages due to the early termination. This position contrasted sharply with previous communications, during which AB had given no indication that the complaints raised by DG over the phone, or their request to take over property management, would amount to a breach or termination. The Plaintiff had anticipated that the resolution process for the other properties would follow the same path as the one used for Fiddler's Creek. However, this time AB, instead of working towards a resolution, responded by formally declaring a breach.

### AB Improperly Billed Plaintiff for Services Plaintiff Had Already Paid For

Further, as part of the Agreements, AB was compensated with a Property Management Fee to manage Plaintiff properties. This fee was intended to cover general maintenance and property management services. However, in addition to the Property Management Fee, Plaintiff has been billed for a significant number of additional maintenance fees by AB that were both improper or should have been included in the Property Management Fee.

Plaintiff has consistently requested receipts and detailed explanations for these extra maintenance charges, but AB has failed to provide them. Instead, AB has only offered vague statements, suggesting that the work was performed by an in-house maintenance team. Upon reviewing the available statements, it appears that a considerable portion of the work billed under the "maintenance" category should have been included within the Property Management Fee that had already been paid.

There were no additional written agreements between the parties that specified or agreed to any extra maintenance charges beyond what was included in the Property Management Fee.

Despite this, AB charged Plaintiff for tasks such as assisting guests with hot water issues, checking propane levels, fixing TV problems, delivering ice trays, inspecting for leaks, and addressing WIFI and hot tub issues—services that should have been covered by the Property Management Fee. As of the date of this motion, Defendants have failed to provide an accounting to Plaintiff, despite multiple requests.

### *Attempted Mediation*

In February 2024, Plaintiff received a demand from AB's attorney asserting that Plaintiff "canceled" the Agreements, which resulted in a material breach. Because the parties could not reach an agreement as to the dispute, per the Agreements, AB demanded mediation.

In response, Plaintiff agreed to mediation as a good faith effort to resolve the dispute, clarifying that its acceptance did not constitute an admission of fault or breach. The mediation was not successful.

On July 17, 2024, DG sent a notice of termination to AB, with the intent of ending the Agreements for Pine Crest, Sunset Road, Backwoods Way, Ashli Erin, and Raven Fork, effective August 25, 2024. 71. However, by August 19, 2024, Plaintiff agreed to hold off on taking possession in hopes of coming to an agreement. AB still manages Plaintiff properties as of the date of this Motion.

### *Defendants Documented Theft from Plaintiff*

In August 2024, Plaintiff received financial statements from AB for its properties, detailing income, expenses, and disbursements. These statements included a line-item charge of $140,137.00 labeled as "Breached Contract Damages Owed." Without permission, AB unilaterally accessed Plaintiff's trust account and withdrew $77,549.28, allegedly to cover a portion of what Defendants claim are breach of contract damages.

The falsely claimed breach appears to be linked to Defendants' belief that Plaintiff had breached the Agreements. However, this is all speculation on the part of Plaintiff. Defendants have failed to provide a clear explanation or calculation for the $140,137 figure or any specific contractual terms that justify this amount.

AB also withdrew funds from trust accounts related to properties that were not involved in the controversy. AB has indicated that it will continue withdrawing funds from Plaintiff's trust accounts for what it deems ongoing breach of contract damages.

To date, Defendants have not filed any lawsuit against Plaintiff for breach of contract, nor is there any judgment, court order, or other legal document that entitles AB to claim damages from Plaintiff. Furthermore, there is no written agreement between the parties that grants AB the right to unilaterally withdraw funds from the trust account or impose damages.

## III. Legal Standard

### a. Declaratory Judgment

Under 28 U.S.C. § 2201(a), titled "Creation of Remedy," a court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such." *See Skyworks, Ltd. v. CDC*, 542 F. Supp. 3d 719, 723 (N.D. Ohio 2021).

In deciding whether a case is suitable for declaratory judgment, the court will look at such factors as (1) whether the judgment would settle the controversy; (2) whether the declaratory action would serve a useful purpose in clarifying the legal relations at issue; (3) whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for a race for *res judicata*"; (4) whether the use of a declaratory action would increase friction between

our federal and state courts and improperly encroach on state jurisdiction; and (5) whether there is an alternative remedy that is better or more effective. *Grand Trunk Western R.R. v. Consolidated Rail Corp.*, 746 F.2d 323, 325-26 (6th Cir. 1984).

### b. Preliminary Injunction and Temporary Restraining Order

Rule 65 of the Federal Rules of Civil Procedure permits a party to seek injunctive relief to prevent immediate and irreparable injury, loss, or damage. Fed. R. Civ. P. 65. "[T]he party seeking a preliminary injunction bears the burden of justifying such relief." *Am. Civil Liberties Union Fund of Mich. v. Livingston Cnty.,* 796 F.3d 636, 642 (6th Cir. 2015); *see also* Fed. R. Civ. P. 65(b).

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981); *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007). "[A] preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Id*.

Four factors guide the decision to grant a preliminary injunction: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury absent the injunction; (3) whether the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of an injunction." *Bays v. City of Fairborn*, 668 F.3d 814, 818-19 (6th Cir. 2012); *S. Glazer's Distribs. of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 849 (6th Cir. 2017)

These four considerations are "factors to be balanced, not prerequisites that must be met." *Jones v. City of Monroe*, 341 F.3d 474, 476 (6th Cir. 2003). (citing *In re De Lorean Motor Co.*, 755 F.2d 1223, 1228 (6th Cir. 1985)).

### IV. Argument

### A. Declaratory Judgment

#### i. The Provision in the Management Agreement Requiring Mighty Peaks to Be the Broker Is Invalid and Unenforceable

The Agreements contain a provision stating, "Promotions below require Sale of cabin be handled by Co-owned Mighty Peaks Realty, while also retaining new Buyer on the rental program for the remainder of Seller's contractual term (no less than twelve months) upon the sale"

This clause, requiring Plaintiff to use a specific realty company, is a restraint of trade because it limits Plaintiff's ability to freely choose another real estate agent or brokerage. This clause is a violation of the agreements in restraint of trade provision under the Tennessee Anti-Trust Act that prohibits contracts that tend to lessen free competition and trade in Tennessee. *See* Tenn. Code Ann. §47-25-101. Furthermore, although Plaintiff has not at this time alleged any Federal claims, Section 1 of the Sherman Antitrust Act prohibits "every contract, combination . . ., or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1.

Given these principles, the restrictive provision in the Agreement infringes upon the Plaintiff's fundamental right to choose their own real estate agent and should be deemed unenforceable.

#### ii. The Provision in the Agreement Requiring a Future Buyer to Use AB As Property Management Company is Invalid and Unenforceable

Again, the Agreements contain a provision stating, "Promotions below require Sale of cabin be handled by Co-owned Mighty Peaks Realty, while also retaining new Buyer on the rental program for the remainder of Seller's contractual term (no less than twelve months) upon the sale"

Tennessee recently enacted the "Real Property Records Integrity Act" ("Act") pursuant to Tenn. Code Ann. §66-33-101, et al. Tennessee public policy "favors the transferability of interests

in real property free from unreasonable restraints on alienation and covenants or servitudes that do not touch and concern the property." Tenn. Code Ann. §66-33-103(a)(1). Thus, under the Act, the Future Buyer Provision is unenforceable. Under the Act, a recorded service agreement is void and unenforceable if the agreement purports to run with the land or to be binding on future owners of interests in the real property. *Id.* Therefore, the Future Buyer Provision is illegal and unenforceable under Tennessee law, and Plaintiff requests a preliminary ruling that this provision is unenforceable.

### iii. Plaintiff is Entitled to Declaratory Judgment

A declaratory judgment is essential in this case to determine the enforceability of the disputed contract provisions in the Agreements. This judgment would resolve the central controversy by providing a definitive legal ruling on whether these provisions are valid under Tennessee law. It would clarify the legal rights and obligations of both parties, particularly informing the Plaintiff that they can proceed with a sale of the properties and retain control of the properties.

A declaratory judgment would prevent further disputes or litigation by clarifying the legal relations between the parties. The request for such a judgment is not a procedural tactic but a necessary step to resolve the fundamental legal questions at the center of this litigation relating to the parties' interpretations of the identified clauses within the Agreements. No alternative remedy at this time would offer the same level of clarity or effectiveness in addressing these issues.

Moreover, granting a declaratory judgment would not create friction between federal and state courts or improperly encroach on state jurisdiction; instead, it would interpret certain provisions in a contract, and uphold Tennessee's laws governing real estate contracts. Therefore, a

declaratory judgment is appropriate to prevent ongoing or future conflicts regarding the enforceability of the contract provisions in question while the lawsuit is pending.

### B. Preliminary Injunction

In addition to a declaratory judgment, Plaintiff requests a preliminary injunction requesting the Court to impose and/or prevent specific actions by Defendants.

#### i. Plaintiff Is Likely to Succeed on The Merits of Its Complaint

The first factor to consider is whether the Plaintiff can demonstrate "a strong likelihood of success on the merits." *Certified Restoration Dry Cleaning Network, L.L.C*, 511 F.3d at 535, 543. A party "is not required to prove his case in full at a preliminary injunction hearing." *Camenisch*, 451 U.S. at 395. Plaintiff must only demonstrate that the legal issues it raises are substantial enough to constitute "fair ground[s] for litigation and thus [require] more deliberate investigation." *Roth v. Bank of Commonwealth*, 583 F.2d 527, 537 (6th Cir. 1978).

"[I]t is ordinarily sufficient if the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation." *Six Clinics Holding Corp. v. Cafcomp Sys., Inc.*, 119 F.3d 393, 402 (6th Cir. 1997) (citing *In re De Lorean Motor Co.*, 755 F.2d at 1223, 1228.

##### a. Breach of Contract

Plaintiff has alleged a breach of contract claim against the Defendants for breach of the Agreements. Most egregiously, Defendants have stolen certain trust monies belonging to Plaintiff and itemized those charges as "Breach of contract" charges. Further, Defendants have failed to provide Plaintiff detailed accounting records, invoices, and receipts for Plaintiff's properties in violation of Tennessee real estate rules and statutes. Defendants engaged in improper accounting practices by charging Plaintiff for maintenance and repair services that should have been covered

under already paid property management fees. These actions constitute a material breach of the Agreements and the duty of good faith and fair dealing, resulting in damages to Plaintiff.

*b. Conversion*

Plaintiff has alleged a conversion claim against the Defendants stating that Defendants wrongfully took and misappropriated escrow funds in the amount of $77,549.28 from Plaintiff's trust accountings. Specifically, the Defendants unilaterally withdrew money from these accounts, allegedly to cover supposed breach of contract damages without Plaintiff's permission or any legal justification. Defendants actually invoiced Plaintiff for "Breach of Contract Damages." This money is specific and identifiable and is in the possession of Defendants. As a result of Defendants' conversion, Plaintiff has experienced significant financial damages and expects the Defendants to continue converting further money barring judicial intervention.

*c. Professional Negligence*

Plaintiff has alleged a professional negligence claim against Defendants. Plaintiff will likely succeed on this claim due to clear and egregious breaches of the duties owed by Defendants as licensed real estate agents and a vacation rental services agency. The Defendants were obligated to exercise reasonable skill and care in managing the Plaintiff's properties, acting with honesty, good faith, and integrity. However, the Defendants have grossly neglected these duties, as evidenced by their mismanagement of trust funds, failure to provide accurate and timely accounting, and the unjustified inflation of maintenance fees. These actions demonstrate their disregard for the Plaintiff's best interests.

*d. Intentional Misrepresentation, Fraudulent Inducement, and/or Negligent Misrepresentation*

Plaintiff has alleged that the Defendants intentionally misrepresented, fraudulently induced and/or negligently misrepresented the projected income of the properties they purchased through Mighty Peaks. The Defendants engaged in conversations with Plaintiff regarding the potential income related to the properties, and used false reports and numbers that did not accurately reflect the true income potential of the properties. An example of these reports is attached to the Complaint as **Exhibit D**. The immediate actual revenue for the properties ranged from 20% to 65% lower than the projected figures for the properties. Defendants actually knew of the misleading nature of the representations and used those representations to fraudulently induce Plaintiff into both purchasing the properties through Mighty Peaks and using AB's property management services. As a result of this misrepresentation and/or negligent misrepresentation, Plaintiff has suffered significant financial damages.

e. *Violations of the Tennessee Real Estate Broker Act for Vacation Lodging Services*

Plaintiff will likely succeed in showing the Court that Defendants conduct has violated various provisions of the Tennessee Real Estate Broker Act for Vacation Lodging Services, as outlined in Tenn. Code Ann. §62-13-104 and Plaintiff's Complaint. These violations include but are not limited to, improperly taking funds from Plaintiff's accounts under false pretenses, making willful misrepresentations about payments and services, failing to provide accurate and timely financial records, and neglecting to maintain proper documentation for its escrow and trust accounts.

f. *Tennessee Consumer Protection Act Violation*

Plaintiff has alleged Defendants violated the Tennessee Consumer Protection Act ("TCPA"). The TCPA penalizes persons and companies that engage in unfair or deceptive acts. Pursuant to Tenn. Code Ann. § 47-18-104(b)(13) is an unfair and deceptive trade practice when

someone "[r]epresent[s] that a service, replacement, or repair is needed when it is not." Further, it is also a violation of the TCPA when someone "[f]ail[s] to disclose that a charge for the servicing of any goods in whole or in part is based on a predetermined rate or charge, or guarantee or warranty, instead of the value of the services actually performed." Tenn. Code Ann. § 47-18-104(b)(15).

AB has repeatedly failed to disclose the basis of many charges, indicating that some expenses were predetermined rather than based on the actual value of the services performed. These actions are in direct violation of the TCPA.

All the relevant properties have been subjected to some form of maintenance charge each month – costing Plaintiff additional and unnecessary expenses. Further, it appears that AB has represented that work and repairs are needed when in fact were not. As a result of these violations, Plaintiff is entitled to treble damages under the Tennessee Consumer Protection Act.

g. *Tennessee Real Estate Broker's Act Violations*

The Tennessee Real Estate Broker License Act ("Broker Act") imposes specific duties on real estate professionals, including property management companies. Plaintiff will easily be able to show that Defendants breached these duties.

The Broker Act identifies numerous duties, including, but not limited to, the following:

(1)  Diligently exercise reasonable skill and care in providing services to all parties to the transaction;
(2)  Disclose to each party to the transaction any adverse facts of which the licensee has actual notice or knowledge….
(4) Provide services to each party to the transaction with honesty and good faith….
(6) Timely account for trust fund deposits and all other property received from any party to the transactions.

Tenn. Code Ann. § 62-13-403. Further obligating real estate professionals to:

1)  Obey all lawful instructions of the client when the instructions are within the scope of the agency agreement between licensee and licensee's client;
(2)  Be loyal to the interests of the client. A licensee must place the interests of the client before all others in negotiation of a transaction and in other activities.

Tenn. Code Ann. § 62-13-104.

Defendants have breached these duties. Defendants have engaged in repeated conduct that breaches these duties and failed to exercise reasonable skill and care in providing services to Plaintiff. Specifically, Defendants have misallocated trust accounts, failed to give an accounting or receipts when requested, and induced Plaintiff to purchase the properties and use AB's services based on false and misleading projections. Defendants have failed to comply with the Broker Act and Plaintiff will likely be able to prove this at trial.

### ii.  Plaintiff Will Suffer Actual and Immediate Irreparable Harm

After determining that a plaintiff has demonstrated a substantial likelihood of success on the merits of his underlying claim, the second factor that a court must consider when deciding whether to issue a preliminary injunction is whether the plaintiff will suffer irreparable injury without the injunction. *Certified Restoration Dry Cleaning Network, LLC.*, 511 F.3d at 535, 550. "A plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages." *Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002) (*citing Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992)).

Without the issuance of a preliminary injunction, Plaintiff will continue to suffer irreparable injury that cannot be fully compensated by monetary damages. The prior and ongoing actions of the Defendants pose an imminent and substantial threat to the Plaintiff's financial stability, business operations, and reputation.

If the Defendants are not enjoined from further accessing the Plaintiff's trust accounts, the Plaintiff will likely continue to experience unauthorized withdrawals and misappropriation of

funds. Defendants have already taken $77,549.28 from Plaintiff. Per the line item on the owner's statements, Defendants believe they are entitled to approximately $63,000 more in "Breach of Contract Damages Owed" which Plaintiff expects will be taken out of their account within the next few months. This financial misconduct that, if allowed to continue, will deplete the Plaintiff financial resources. Significant theft could lead to defaults on loan obligations and failure to make mortgage payments for the Properties. A failure to meet these obligations could result in foreclosure or additional penalties, causing long-term financial damage that cannot be easily remedied.

The Defendants' continued control over the Plaintiff properties and rental operations poses a significant risk to the Plaintiff's Properties and business. Without an injunction, the Defendants will interfere with the management of Plaintiff's properties, including, but not limited to, reassigning bookings, neglecting necessary maintenance, and further inflating charges for services that should be covered by existing agreements. This conduct could result in physical deterioration of the properties, decreased marketability, and diminished rental income—all of which would severely disrupt the Plaintiff' business operations and cause losses that cannot be fully quantified or compensated through monetary damages.

The Plaintiff' reputation in the rental market is also at risk. The Plaintiff has positive reviews for offering clean, safe, and luxurious cabins in East Tennessee. However, the Defendants' mismanagement and potential neglect of the properties could result in negative reviews, canceled bookings, and a tarnished reputation. The damage to the reputation and goodwill of the properties is an injury that cannot be quantified financially, and its effects could persist long after the immediate financial issues are resolved.

Moreover, the Plaintiff face the very real possibility of losing control and access to their properties. The Defendants' refusal to relinquish control and their ongoing interference with the Plaintiff's attempts to sell or manage the properties independently demonstrates a disregard for the Plaintiff's rights as property owners. Without an injunction, the Plaintiff may be forced to take drastic and disruptive measures to regain control of their properties, such as changing locks or terminating contracts unilaterally, which could lead to further disputes, legal complications, and additional harm to the Plaintiff's business relationships and reputation.

Thus, Plaintiff will suffer irreparable injury without the issuance of a preliminary injunction, and the Court's intervention is necessary to prevent further injury to Plaintiff.

### iii. Defendants and Others Will Not Be Affected by the Court's Injunction

The third factor asks, "whether the injunction would cause substantial harm to others[.]" *Bays*, 668 F.3d at 819. This factor weighs in favor of Plaintiff. Issuing an injunction against the Defendants would not cause substantial harm to others. The requested relief is narrowly tailored to prevent the Defendants from engaging in the specific unlawful actions that have caused significant harm to the Plaintiff, such as misappropriating funds. The injunction does not impose any undue burden on third parties or the general public. Instead, it actually serves to protect other property owners from potential similar misconduct by the Defendants.

Additionally, the Defendants do not have a legitimate right to the funds and property interests they have wrongfully taken from the Plaintiff, and therefore, preventing Defendants from further misappropriating these assets does not harm Defendants' legitimate interests. The injunction merely preserves the status quo, ensuring that the Plaintiff' properties and financial interests are protected while the claims are resolved. Thus, the harm to the Defendants is non-

existent and outweighed by the potential for greater harm to the Plaintiff and the public if the injunction is not granted.

### iv. The Public Interest Favors Granting the Injunction

The fourth and final factor for consideration is the public interest in the outcome of the request for injunctive relief. First and foremost, allowing the Defendants to continue their unlawful actions would pose a significant risk to other property owners who may fall victim to similar fraudulent conduct. The Defendants have already demonstrated a pattern of misappropriating trust funds, engaging in unlicensed contracting, and failing to disclose essential information to property owners. Without injunctive relief, the Defendants could replicate these deceptive practices on other unsuspecting property owners, leading to widespread financial harm and the erosion of trust in the property management and real estate industries.

Furthermore, the public has a vested interest in ensuring that licensed professionals, particularly those who manage significant assets like real estate, adhere strictly to their legal and ethical obligations. The Defendants' actions, including their blatant disregard for fiduciary duties and their self-dealing, undermine the integrity of the real estate market. By granting an injunction, the Court would send a clear message that fraudulent behavior, theft, and the violation of professional responsibilities will not be tolerated. This would help to safeguard property interests, ensure that trust monies are handled with the utmost care, and protect the public from unscrupulous actors who might otherwise exploit their positions of power for personal gain.

Additionally, under federal law, the public interest is also served by maintaining the enforceability of contracts and ensuring that legal remedies are available when one party breaches its duties to another. Granting an injunction would uphold these principles by preventing the

Defendants from further breaching their contractual obligations and causing irreparable harm to the Plaintiff and potentially to others.

**V. Bond**

Plaintiff respectfully submits that the facts in the case warrant a no bond as Defendants conduct has financially harmed Plaintiff. Alternatively, the Plaintiff respectfully requests that a minimal bond be appropriate.

**VI.    Plaintiff's Request**

Thus, based on the foregoing, the Plaintiff specifically requests

A.  A preliminary and permanent injunction imposing the following injunctive relief:

    i.  Restoration of stolen funds from DG's trust account in the amount of $140,170.00.

    ii.  An order preventing Defendants from withdrawing any further funds from the Plaintiff's trust accounts, profits, or escrow accounts;

    iii.  An order requiring Defendants to provide a full accounting of all finances related to the Plaintiff's properties;

    iv.  An order for the immediate return of control over Plaintiff's properties from the Defendants back to the Plaintiff;

    v.  Any other relief the Court deems property.

B.  Plaintiff further requests a declaratory judgment from this Court that:

    i.  The provisions in the Agreements requiring DG to require a future buyer to use AB as the property management company are unenforceable under the Real Property Records Integrity Act pursuant to Tenn. Code Ann. § 66-33-101;

ii. The Section in the Agreement labeled "other" contains unenforceable provisions under Tennessee law and the restraints on alienation are illegal and thus unenforceable; and

iii. Any other declaratory judgment that Plaintiff is entitled to.

C. A temporary restraining order preventing the Defendants from:

i. Removing any more money from Plaintiff's trust accounts and profits; and

ii. Requiring Defendants to peacefully transition control of the Properties back to the Plaintiff;

iii. any other temporary restraining order relief the Plaintiff is entitled to.

## V. CONCLUSION

For the foregoing reasons, Plaintiff requests that the Court grant its request for declaratory judgment and preliminary injunctive relief and/or temporary restraining order.

Respectfully submitted,

**ANDERSON LEGAL, PLLC**

By:     /s/ *Matthew J. Anderson*
**Matthew J. Anderson, Esq.** / BPRN 34909
**Regan Sherrell, Esq.** / BPRIN 039544
49 Music Sq. W. Suite 500
Nashville, TN 37203
matt@andersonlegaltn.com
regan@andersonlegaltn.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing has been forwarded via email service to:

Michael J. King
Paine, Bickers, Elder, King & Williams
900 S. Gay St. Suite 2200
Knoxville, TN 37902
(865) 525-0880
mking@painebickers.com
*Attorney for Defendants*

This the 6th day of September 2024.

*s/ Matthew J. Anderson*

**Matthew J. Anderson**