UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| DG SMOKY, LLC, and | ) | |
| WINGSPAN RENTAL, LLC | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 3:24-CV-364-TAV-JEM |
| v. | ) | |
| | ) | |
| AUNT BUG'S CABIN RENTALS, LLC, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**REPORT AND RECOMMENDATION**

This case is before the undersigned pursuant to 28 U.S.C. § 636, the Rules of this Court, and the Order [Doc. 15] referring the matter by United States District Judge Thomas A. Varlan.

Now before the Court is Plaintiffs' Motion for Declaratory Judgment and Preliminary Injunction and/or Temporary Restraining Order [Doc. 12]. Defendants responded in opposition to the motion [Doc. 21], and Plaintiffs replied [Doc. 22]. The motion is ripe for adjudication. *See* E.D. Tenn. L.R. 7.1(a).

On September 24, 2024, the parties appeared before the undersigned for a motion hearing.[1] Attorney Matthew Anderson appeared on behalf of Plaintiffs. Attorney Michael King appeared on behalf of Defendants. For the reasons explained below, the undersigned **RECOMMENDS** that the District Judge **DENY** Plaintiffs' motion [**Doc. 12**].

---

[1] The parties addressed a similar motion filed in *DCJM, LP v. Aunt Bug's Cabin Rentals LLC*, No. 3:24-cv-354. While related, the cases are not consolidated [Doc. 7].

# I.    BACKGROUND

Plaintiffs DG Smoky, LLC ("DG") and Wingspan Rental, LLC ("Wingspan") are "real estate investment compan[ies] that buy[] and hold[] real estate for certain income purposes, including but not limited to, short-term and long-term rentals" [Doc. 1 ¶¶ 10, 12]. Plaintiff DG owns investment properties in East Tennessee, including:

1. 1610 Jobey Green Hollow Road, Sevierville, TN 37876 ("Jobey")

2. 1910 Orchard Drive, Sevierville, TN 37876 ("Orchard Drive")

3. 1911 Oakmont Drive, 1911 Oakmont Drive ("Oakmont")

4. 2314 Backwoods Way, Gatlinburg, TN 37738 ("Backwoods Way")

5. 2475 E. View Drive, Sevierville, TN 37876 ("E. View")

6. 2737 Pine Crest Lane, Sevierville, TN 37862 ("Pine Crest")

7. 2918 Fiddlers Creek Way, Pigeon Forge, TN 37869 ("Fiddlers Creek")

8. 2955 Raven Fork Circle, Sevierville, TN 37876 ("Raven Fork")

9. 4164 Burning Tree Lane, Sevierville, TN 37862 ("Burning Tree")

10. 2420 Sunset Road, Sevierville, TN 37862 ("Sunset Road")

11. 4416 Ashlie Erin Way, Gatlinburg, TN 37738 ("Ashlie Erin")

[*Id*. ¶ 11]. Plaintiff Wingspan owns 2243 Wingspan Drive, Sevierville, TN 37876 ("Wingspan Drive") [*Id*. ¶ 13].

Defendant Aunt Bug's Cabin Rentals, LLC ("AB") "is a Tennessee licensed vacation lodging service firm that provides services for the management and rental of luxury cabins in East Tennessee on behalf of properties owners, earning commission for its services" [*Id*. ¶ 14]. Defendants Brian Spiezio and Shawn Spiezio are Tennessee licensed affiliate brokers for Mighty Peaks Realty, LLC ("Mighty Peaks") [*Id*. ¶¶ 15, 17]. Defendant Brian Spiezio is the designated

agent and Chief Operating Officer for Defendant AB [*Id*. ¶ 16]. Defendant Shawn Spiezio is the principal real estate broker for Mighty Peaks and the president of Defendant AB [*Id*. ¶ 18].

According to the Complaint, "On September 27, 2022, [Plaintiff] DG entered into a property management agreement with [Defendant] AB to hire [it] for property management services for [Plaintiff] DG's properties in exchange for a commission ("DG Management Agreement")" [*Id*. ¶ 19]. On October 14, 2022, Plaintiff Wingspan also entered into a property management agreement ("Wingspan Management Agreement") [*Id*. ¶ 20]. "Both the DG Management Agreement and the Wingspan Management Agreement contained the same general terms, with the only differences being the specific property identifiers corresponding to the respective properties" [*Id*. ¶ 21]. They contain the following provisions:

a.  A termination date of December 31, 2030, unless canceled after a 24-month term with 90-day notice;

b.  A "Promotion" section where the Plaintiffs select a promotion package that would extend the Minimum Term in exchange for waiving certain fees;

c.  A clause that states any breach or early termination before the Minimum Term will void all Owner promotions and require the Owner to reimburse AB for the value of those promotions;

d.  A provision stating that "Promotions below require Sale of cabin be handled by Co-owned Mighty Peaks Realty, while also retaining new Buyer on the rental program for the remainder of Seller's contractual term (no less than twelve months) upon the sale" and;

e.  A mediation provision stating "[a]ny breach in contract or early termination that could not be resolved between Company and Owner may result in legal mediation that would be subsidized by party that cancels said contract."

[*Id*. ¶ 22]. Plaintiffs state that these agreements "do not contain rental rates or markup or profit for expenses/maintenance" [*Id*. ¶ 23].

According to Plaintiffs, "[p]rior to purchasing the Properties, [they] engaged in conversations with [Defendant] AB regarding the potential income related to the Properties using [its] property management services" [*Id*. ¶ 24]. Plaintiffs claim that "[Defendant AB] provided [them] with false projections, which were a deliberate misrepresentation to fraudulently induce [Plaintiff DG] into the contracts" [*Id*. ¶ 25]. Specifically, Defendant Brian Spiezio with Mighty Peaks provided these written projections, but they "were not based upon accurate information" and "[t]he actual revenue for 2023 fell significantly short of these projections" [*Id*. ¶¶ 26, 28, 30–31]. According to Plaintiffs, there is no evidence that there were "deficient market circumstances that would have affected the income or revenue to such an extent" [*Id*. ¶ 35]. On August 7, 2023, Plaintiff DG took over the management of Fiddlers Creek, and it "noticed a substantial increase in income and performance" [*Id*. ¶¶ 38–39].

In 2024, Plaintiffs expressed frustration about the performance of the other properties Defendant AB managed [*Id*. ¶ 40]. Plaintiffs and Defendant Shawn Spiezio discussed these concerns over a telephone call, and he "led [them] to believe that, like with Fiddlers Creek, [Defendant] AB would be amendable to an agreement whereby certain properties would be released to [Plaintiff DG] by agreement" [*Id*. ¶¶ 42–43]. Defendant Shawn Spiezio asked Plaintiffs to summarize the concerns in an email, which they did, but Defendant AB did not respond [*Id*. ¶¶ 44–46]. On February 2, 2024, Defendant AB's counsel sent a letter to Plaintiffs declaring them to be in breach of the Management Agreements [*Id*. ¶ 47]. According to Plaintiffs, in the letter, "[Defendant] AB [took] the position that, due to a breach by Plaintiffs, [Defendant] AB [was] entitled to the 'full benefit it would have received under the Agreements' complete three-year terms'" [*Id*. ¶ 48]. In addition, Plaintiffs claim:

> Further, the attorney letter claimed "[b]ecause you chose to participate in the promotion, the term of each of the Agreements was

4

increased to three years. If you choose to terminate the Agreements prior to the expiration of the term, you are required to reimburse [Defendant] AB the cost of all annual promotions' value. Based on prior revenue for the subject units, [Defendant] AB lost rental commissions under the full three-year terms of the Agreements total over $270,000."

Additionally, [Defendant] AB has taken the position that "it would have received over $108,000 in booking fees under the remaining portion of the three-year terms. These are consequential damages resulting directly from your breach."

[*Id*. ¶¶ 49–50].

Plaintiffs state that "a[s] part of the Management Agreements, [Defendant] AB was paid a property management fee ("Property Management Fee") for the management of Plaintiffs' [P]roperties[,]" which "cover[s] general maintenance and property management services [*Id*. ¶¶ 55–56]. They claim that they have been billed maintenance fees that should have been covered by the Property Management Fee [*Id*. ¶ 57]. Plaintiffs state that although they have requested receipts and/or explanations, Defendant AB has not provided such information but instead has only provided "generic statements suggesting the work is performed by an in-house maintenance team" [*Id*. ¶¶ 58–59]. "There were no additional written agreements between the parties specifying and agreeing to any extra maintenance charges beyond those included in the Property Management Fee" [*Id*. ¶ 61]. For instance, Plaintiffs state, they have been charged for "assisting guests with hot water issues, checking for propane, fixing TV issues, delivering ice trays, inspecting for leaks, and addressing WIFI and hot tub issues" [*Id*. ¶ 62].

The Complaint further alleges that "[Defendant Brian] Spiezio stayed in Plaintiffs' cabins and allowed miscellaneous family members to stay in the cabins without properly charging them and/or paying Plaintiffs for the use" [*Id*. ¶ 63].

5

Claiming that Plaintiff DG canceled the Management Agreement, Defendant AB demanded mediation in February 2024 [*Id*. ¶ 64]. It also "alleged that because [Plaintiff] DG chose to participate in the promotion, the terms increased by three years[] and that [Plaintiff] DG failed to satisfy the 90-day notice requirement" [*Id*. ¶ 66]. Plaintiff DG mediated with Defendant AB, but the parties did not settle [*Id*. ¶¶ 68–69].

"On July 17, 2024, [Plaintiff] DG sent a notice of termination ("Notice of Termination") to [Defendant] AB, with the intent of ending the Management Agreements for Pine Crest, Sunset Road, Backwoods Way, Ashli Erin, and Raven fork, effective August 25, 2024" [*Id*. ¶ 70]. But it agreed not to take "possession in hopes of coming to an agreement" [*Id*. ¶ 71].

According to Plaintiffs, "[i]n August 2024, [Plaintiff] DG received owner statements ("Owner Statements") for multiple properties from [Defendant] AB providing a financial summary of the income, expenses, and disbursements for the management of the properties" [*Id*. ¶ 72]. Listed on the Owner Statements was a charge and debit by Defendant AB under "unit expenses" for breach of contract damages in the amount of $140,137 [*Id*. ¶ 73]. Plaintiffs state that "[w]ithout prior discussion or permission from [Plaintiff] DG, [Defendant] AB unilaterally accessed the trust account for [Plaintiff] DG and withdrew the sum of $77,594.28, to cover these supposed breach of contract damages" [*Id*. ¶ 74].

Based on the above, Plaintiffs plead nine causes of action: (1) declaratory judgment and injunctive relief [*id*. ¶¶ 82–92]; (2) breach of contract [*id*. ¶¶ 93–99]; (3) conversion [*id*. ¶¶ 100–06]; (4) professional negligence [*id*. ¶¶ 107–11]; (5) intentional misrepresentation and fraudulent concealment [*id*. ¶¶ 112–20]; (6) negligent misrepresentation [*id*. ¶¶ 121–28]; (7) violation of the Tennessee Real Estate Broker Act for Vacation Lodging Services [*id*. ¶¶ 129–33]; (8) violations

of the Tennessee Consumer Protection Act [*id*. ¶¶ 134–40]; and (9) violations of the Tennessee Real Estate Broker License Act [*Id*. ¶¶ 141–49].

On September 6, 2024, Plaintiffs filed a Motion for Declaratory Judgment and Preliminary Injunction and/or Temporary Restraining Order [Doc. 12]. Plaintiffs argue that a "[d]eclaratory judgment will settle the breach of contract controversy between the parties[] and serve a useful purpose in clarifying the legal relations between the parties" [*Id*. at 1]. In addition, they submit that they have established their burden to show injunctive relief is warranted and that they will sustain irreparable harm without an injunction [Doc. 14 pp. 12–20]. In support of their motion, they have filed an Affidavit of Matthew Anderson [Doc. 12-1], their counsel.

Defendants respond that Plaintiffs' request for declaratory judgment is premature and not warranted under the law [Doc. 21 pp. 17–20]. Further, Defendants state that Plaintiffs are not entitled to an injunction because there is no threat of immediate, irreparable harm and that an injunction would not maintain the status quo [*Id*. at 5–10]. They state that they have returned the funds to Plaintiff DG's trust account in the amount of $77,549.28 and will not make further deductions unless the Court allows [*Id*. at 4]. In addition, Defendants submit that Plaintiffs cannot show that they have a likelihood of success on their claims, noting, among other things, that they did not present any proof, including a verified Complaint [*Id*. at 10–17]. In support of their opposition, they filed the Declaration of Shawn Spiezio [Doc. 21-1] and Plaintiffs' Owners Rental Agreements [Doc. 21-2].

Plaintiffs reply that Defendants' return of the funds "does not negate the fact that a breach and theft of money occurred" [Doc. 22 p. 2]. Declaratory and injunctive relief are warranted, Plaintiffs argue, "to prevent further injuries and protect [their] rights as . . . property owner[s] moving forward" [*Id*. at 3]. According to Plaintiffs, they need an order from the Court for a

7

peaceful transition of the properties [*Id.* at 4]. They deny they need a verified Complaint for their

requested relief [*Id.* at 5–6].

## II.    DECLARATORY JUDGMENT

Plaintiffs seek a declaratory judgment from the Court declaring that:

1.    The provisions in the Management Agreements requiring [Plaintiff] DG to require a future buyer to use [Defendant] AB as the property management company are unenforceable under the Real Property Records Integrity Act pursuant to Tenn. Code Ann. § 66-33-101;

2.    The Section in the Management Agreement labeled "other" contains unenforceable provisions under Tennessee law and the restraints on alienation are illegal and thus unenforceable; and

3.    Any other declaratory judgment that Plaintiff[s are] entitled to.

[Doc. 14 p. 2].

Plaintiffs assert that they are entitled to a declaratory judgment, arguing that the relevant

factors weigh in their favor [Doc. 14 pp. 10–12]. They claim that "[a] declaratory judgment is

essential in this case to determine the enforceability of the disputed contract provisions in the

[Management] Agreements" [*Id.* at 11].

Defendants respond that "[a] declaratory judgment as to the parties' rights and obligations

under the Management Agreements and enforceability of the same would be premature at this

time" [Doc. 21 p. 17]. They assert that they "have not had the opportunity to develop the record or

engage in discovery, and declaratory relief would decide issues of fact pertinent to claims asserted

by both parties" [*Id.*]. Stating that they intend to assert a counterclaim for Plaintiffs' breach of the

Management Agreements, Defendants argue that "determining the parties' rights without

considering [their] counterclaim would be a waste of the parties' and judicial resources" [*Id.*]. With

respect to Plaintiffs' request for a declaratory judgment relating to the Tennessee Real Properties

Records Integrity Act, Defendants state that it only covers residential real estate, and therefore, it is not applicable here [*Id*. at 19].

Pursuant to 28 U.S.C. § 2201, "upon the filing of an appropriate pleading, [the Court] may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). Section 2201 further provides that "[a]ny such declaration shall have the force and effect of a final judgment and shall be reviewable as such." *Id*. "The 'useful purpose' served by the declaratory judgment action is the clarification of legal duties for the future, rather than the past harm a coercive tort action is aimed at redressing." *AmSouth Bank v. Dale*, 386 F.3d 763, 786 (6th Cir. 2004).

The United States Sixth Circuit Court of Appeals has articulated five factors for a court to use in determining whether to enter a declaratory judgment:

> (1) whether the declaratory action would settle the controversy; (2) whether the declaratory action would serve a useful purpose in clarifying the legal relations in issue; (3) whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for a race for res judicata;" (4) whether the use of a declaratory action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction; and (5) whether there is an alternative remedy which is better or more effective.

*Grand Trunk W. R. Co. v. Consol. Rail Corp.*, 746 F.2d 323, 326 (6th Cir. 1984). These are known as the *Grand Trunk* factors. "[The Sixth Circuit] has 'never assigned weights to the *Grand Trunk* factors when considered in the abstract' and the factors are not always considered equally." *Cardinal Health, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 29 F.4th 792, 797 (6th Cir. 2022) (quoting *W. World Ins. Co. v. Hoey*, 773 F.3d 755, 759 (6th Cir. 2014)).

Courts generally analyze the first two factors collectively. *See Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 557 (6th Cir. 2008) ("The second factor in the *Grand Trunk* analysis is

9

closely related to the first factor and is often considered in connection with it. Indeed, it is almost always the case that if a declaratory judgment will settle the controversy, then it will clarify the legal relations in issue." (citations omitted)); *Travelers Indem. Co. v. Bowling Green Pro. Assocs., PLC*, 495 F.3d 266, 272 (6th Cir. 2007) (analyzing these factors together). Plaintiffs assert that "[t]his judgment would resolve the central controversy by providing a definitive legal ruling on whether these provisions are valid under Tennessee law" [Doc. 14 p. 11]. In addition, Plaintiffs state that a declaratory judgment "would clarify the legal rights and obligations of both parties, particularly informing the Plaintiff[s] that they can proceed with the sale of the properties and retain control of the properties" [*Id.*].

Defendants respond that these factors weigh against entering a declaratory judgment because the parties have "opposing views to which interpretation would settle the controversy" [Doc. 21 p. 18 (citation omitted)]. Defendants state that Plaintiffs allege "other fact dependent causes of action" [*Id.* at 17]. At the hearing, Defendants noted that their answer is due in November 2024, and they intend to file counterclaims. They claim that a declaratory judgment is "unjustified at this time" because "Plaintiffs are seeking a declaratory judgment [that] will ultimately determine liability on claims [that] have already accrued" [*Id.* at 18 (citation omitted)].

Plaintiffs reply that their declaratory relief does not seek relief for past harms, but instead, it will "allow [them] to exercise their property rights over their real properties without interference from the Defendants" [Doc. 22 p. 3]. According to Plaintiffs, they are "not asking the Court to rule on or litigate the entire merits of the case or grant every request for relief in the Complaint" [*Id.* at 4]. Instead, Plaintiffs seek "control of the properties and [to] sever the management relationship between the parties while the litigation, with the remaining rights and obligation[s] of the parties to be determined at a later date" [*Id.*].

10

The undersigned finds the declaratory judgment would not settle the controversy and would not serve a useful purpose in clarifying the legal relations in issue. Plaintiffs' request for declaratory judgment seeks to declare the parties' rights and obligations under the Management Agreements, but Plaintiffs allege various other fact-dependent causes of action, such as professional negligence, negligent misrepresentation, violations of the Tennessee Real Estate Broker Act for Vacation Lodging Services, and the Tennessee Consumer Protection Act. *See Grimm v. Shroyer*, 35 F. Supp. 2d 966, 973 (E.D. Ky. 1999) (declining to exercise discretion under the Declaratory Judgment Act where a finding that that statute at issue is unconstitutional would not settle the entire controversy between the parties because they still had disputes that "would not be affected by the declarations requested"). Further, it would not resolve Defendants' anticipated counterclaims. *See Guild Assocs., Inc. v. Bio-Energy (Washington) LLC*, No. 2:13-CV-1041, 2015 WL 13034879, at *7 (S.D. Ohio Feb. 12, 2015) (declining to issue a declaratory judgment where it "would not resolve [the defendant's] counterclaims regarding fraud in the inducement or breach of the . . . purchase order").

Indeed, Plaintiffs seek damages in this case for breach of contract, so the declaratory judgment would not resolve the matter [Doc. 1 p. 23]. *See Gregor v. Rice Drilling D, LLC*, No. 2:21-CV-3999, 2024 WL 169119, at *4 (S.D. Ohio Jan. 16, 2024) ("[I]ssuing a declaratory judgment would not settle the parties' controversy and would not be useful in clarifying the legal relations at issue, as [the p]laintiffs seek damages for Defendants' alleged breach of the Smith-Goshen Leases. The adjudication of [the p]laintiffs' breach of contract claim will necessarily decide the status of the contractual relationship." (citation omitted)); *Little Mountain Precision, LLC v. DR Guns, LLC*, No. 22 CV 1471, 2023 WL 1816711, at *5 (N.D. Ohio Feb. 8, 2023) ("Issuing a declaratory judgment would not settle the parties' controversy, as plaintiff also seeks

damages as a result of the [c]orporate [d]efendants' alleged breach of the Force Majeure Agreements."). And further, a declaratory judgment would not clarify the legal relations between the parties here "[b]ecause granting Plaintiff[s'] request will require the resolution of disputed questions of fact, [and] a declaratory judgment at this stage of the proceeding, with an undeveloped record, would be premature." *Royster v. Riley*, No. 206-CV-293, 2007 WL 1595423, at *1 (W.D. Mich. May 31, 2007) (denying the plaintiff's motion for declaratory judgment).[2]

Factor three—whether the declaratory remedy is being used for the purpose of procedural fencing—is neutral here. There is no evidence that Plaintiffs are using their request for a declaratory judgment for this purpose. *See W. World Ins. Co.*, 2013 WL 5372769, at *4 ("Courts are reluctant . . . to impute an improper motive to a plaintiff if there is no evidence of one in the record." (citing *Scottsdale Ins. Co.*, 513 F.3d at 558)); *see also United Specialty Ins. Co. v. Cole's Place, Inc.*, 936 F.3d 386, 399 (6th Cir. 2019) ("If there is no evidence of procedural fencing, we often find that the factor is 'neutral,' and "does not point toward *denying* jurisdiction[.]" (citations omitted)); *Wilmington Sav. Fund Soc'y, FSB v. Kattula*, No. 16-CV-12813, 2024 WL 3160320, at *10 (E.D. Mich. June 25, 2024) (finding the third factor neutral because there was no evidence of procedural fencing).

The fourth factor, increasing the friction between state and federal courts and improperly encroaching upon state jurisdiction, is either neutral or not relevant as there is no underlying state

---

[2]    The record is legally undeveloped at this time. Plaintiffs seek a declaratory judgment that the Management Agreements are enforceable under the Tennessee Real Property Records Integrity Act [Doc. 12 p. 2]. Defendants respond that this "Act applies to contracts 'pursuant to which a person agrees to provide services in connection with the sale of residential real estate or the sale of any product or the performance of any personal service on or for the maintenance of residential real estate'" [Doc. 21 p. 19 (emphasis omitted) (quoting Tenn. Code Ann. § 66-33-102(4))]. "[Because] the Management Agreement[s] are used for commercial purposes[,]" Defendants assert this Act is not applicable [*Id.*]. Plaintiffs do not respond to this argument.

proceeding. *See Wilmington Sav. Fund Soc'y, FSB*, 2024 WL 3160320, at *11 (finding that the fourth factor either supports the exercise of jurisdiction or is not relevant because the issues did not involve difficult questions of state law and there was not a separate state case pending).

With respect to the remaining factor—whether there is an alternative remedy that is better or more effective—the parties do not sufficiently address this factor. While this case appears to be based solely on state law, "it is not clear that the state court would provide a better or more effective remedy." *Id*. at *12.

Considering and weighing these factors, and considering that the record is underdeveloped, the undersigned finds that the *Grand Trunk* factors weigh against entering the declaratory judgment at this stage.[3]

## III.    INJUNCTIVE RELIEF

Plaintiffs seek the following injunctive relief: (1) "[r]estoration of stolen funds from Plaintiff[s'] trust account in the amount of $77,549.28;" (2) "[a]n order preventing Defendants from withdrawing any further funds from the Plaintiff[s'] trust accounts, profits, or escrow accounts;: (3) "[a]n order requiring Defendants to provide a full accounting of all finances related to the Plaintiff's properties;" (4) "[a]n order for the immediate return of control over Plaintiff[s'] properties from the Defendants back to the Plaintiff[s]; and (5) "[a]ny other relief the Court deems proper" [Doc. 12 pp. 2–3]. Plaintiffs also seek "a temporary restraining order preventing Defendants from[] . . . removing any more money from Plaintiff[s'] trust accounts and profits; . . . requiring Defendants to peacefully transition control of the Properties back to the Plaintiff[s]; and . . . any other temporary restraining order relief the Plaintiff[s are] entitled to" [*Id*. at 3].

---

[3]    Defendants noted at the hearing that Plaintiffs' concerns regarding their property can be addressed by expediting the schedule. To the extent an expedited schedule is warranted, the undersigned recommends that the parties discuss it at their Rule 26(f) conference.

13

"Under Federal Rule of Civil Procedure 65, a party may seek injunctive relief if it believes it will suffer irreparable harm or injury during the pendency of the action." *F.S. Sperry Co. v. Schopmann*, 304 F. Supp. 3d 694, 700 (E.D. Tenn. 2018). "If a defendant is on notice . . . a request for a temporary restraining order may be treated as a motion for a preliminary injunction." *Id*. At the hearing, Plaintiffs acknowledged that because Defendants had notice of the motion, their request for a temporary restraining order became one for a preliminary injunction. The undersigned will treat Plaintiffs' motion as such for purposes of this Report and Recommendation.

There are four factors courts weigh in determining whether to grant preliminary injunctive relief:

> (1) whether plaintiff "has shown a strong likelihood of success on the merits"; (2) whether plaintiff will suffer irreparable injury in the absence of an injunction; (3) whether the injunction will cause substantial harm to others; and (4) whether the injunction would serve the public interest.

*Ross v. Parrish*, No. 3:23-CV-15, 2023 WL 2484775, at *5 (E.D. Tenn. Mar. 13, 2023) (quoting *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002)). The moving party bears the burden to show the factors weigh in its favor. *Volkswagen Grp. of Am. Chattanooga Operations, LLC v. SK Battery Am., Inc.*, No. 1:23-CV-246, 2024 WL 718170, at *2 (E.D. Tenn. Jan. 10, 2024). "A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet*, 305 F.3d at 573 (citation omitted). This burden is a "heavy one," *Hum. Rts. Def. Ctr. v. Winn*, 431 F. Supp. 3d 925, 943 (E.D. Mich. 2020), and "is much more stringent than the proof required to survive a summary judgment motion," *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000) (citations omitted).

### A.      Likelihood of Success on the Merits

Plaintiffs state that they have demonstrated the likelihood of success for their claims of breach of contract; conversion; professional negligence; intentional misrepresentation, fraudulent inducement, and/or negligent misrepresentation; and violations of the Tennessee Real Estate Broker Act for Vacation Lodging Services, the Tennessee Consumer Protection Act, and the Tennessee Real Estate Broker License Act [Doc. 14 pp. 12–16].

Defendants respond that this factor weighs in their favor because Plaintiffs "are relying on unverified and controverted allegations as the sole basis for their injunctive relief" [Doc. 21 p. 11]. And the affidavit, Defendants state, "was sworn to by the Plaintiffs' counsel" [*Id.*]. Further, Defendants argue, the affidavit addresses only Defendants' withholding of $77,549.28 and the mediation [*Id.* (citation omitted)]. In other words, Defendants respond that Plaintiffs have not offered any proof, and therefore, they cannot establish their burden [*Id.* at 10–11]. They also outline each claim, arguing why Plaintiffs cannot show that they have a likelihood of success [*Id.* at 12–17].

"A party . . . is not required to prove his case in full at a preliminary-injunction hearing." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) (citation omitted). Even so, "a plaintiff must show more than a mere possibility of success." *F.S. Sperry Co.*, 304 F. Supp. 3d at 701 (quoting *Six Clinics Holding Corp. v. Cafcomp Sys., Inc.*, 119 F.3d 393, 402 (6th Cir. 1997)). "[I]t is ordinarily sufficient if the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation." *Six Clinics Holding Corp., II*, 119 F.3d at 402.

Plaintiffs have not shown they have a likelihood of success "by an affidavit, declaration, or any type of actual evidence." *Taylor v. Wellpath Med.*, No. 3:22-CV-00705, 2023 WL 2923137,

at *2 (M.D. Tenn. Apr. 11, 2023) (recommending denial of the plaintiff's motions for preliminary injunction because he did not file any proof), *report and recommendation adopted*, No. 3:22-CV-00705, 2023 WL 4674300 (M.D. Tenn. July 20, 2023); *see also Hum. Rts. Def. Ctr.*, 431 F. Supp. 3d at 943 (explaining that the plaintiffs "must affirmatively demonstrate their entitlement to injunctive relief"). Instead, Plaintiffs' proof comes from an affidavit by their counsel, Attorney Anderson, who states, "In August 2024, Defendants unilaterally withheld $77,549.28 from the Plaintiffs' trust account, as documented in the Plaintiffs' owner statements for alleged 'breach of contract'"" [Doc. 12-1 ¶ 11]. At the hearing, Plaintiffs noted that Defendants submitted proof to support this assertion and that there is no dispute that it occurred.

According to the Declaration of Shawn Spiezio, on July 17, 2024, Plaintiffs and David Greene sent Defendant AB a notice that they were terminating the Management Agreement for five properties [Doc. 21-1 ¶ 15]. "In response to [Plaintiff DG and David] Greene's breach of the [Management] Agreement, [Defendant AB] asserted its right to recover the gross rent it was otherwise entitled to receive by deducing that amount from rents received from other properties it manages for [Plaintiff DG and David] Greene" [*Id.*]. He states, "In August 2024, a total of $77,549.28 was deducted from revenue received for other [Plaintiff DG and David] Greene properties managed by [Defendant AB] to pay for amounts owed for the early termination of the [Management] Agreement for the five properties where the [Management] Agreement was terminated" [*Id.*]. Defendant Shawn Spiezio states that Defendant AB had a "good faith belief" that it was entitled to the funds, but regardless, it returned them on September 6, 2024 [*Id.* ¶ 16].

Plaintiffs rely on this proof to primarily support their claims for breach of contract and conversion [*See* Doc. 14 pp. 12–13]. But even considering Defendant Shawn Spiezio's statements, Plaintiffs have not made a strong showing that they will be successful on these claims. For instance,

16

a plaintiff asserting a claim for conversion must show that the defendant had "an intent to exercise dominion and control over the property that is in fact inconsistent with the plaintiff's rights." *Mammoth Cave Prod. Credit Ass'n v. Oldham*, 569 S.W.2d 833, 836 (Tenn. Ct. App. 1977) (citation omitted). The only evidence before the Court is that Defendant AB deducted the amount for Plaintiffs' early termination of the Management Agreement related to five properties; there is no evidence at this time that Defendant AB's actions were inconsistent with Plaintiffs' rights. And Defendants returned the money on September 6, 2024.

To the extent Defendant AB's deduction constituted a breach of contract, there is no dispute that Defendant AB returned the funds and therefore cured the breach. *See Spec's Fam. Partners, Ltd. v. First Data Merch. Servs. Corp.*, No. 214CV02995, 2017 WL 4547168, at *5 (W.D. Tenn. July 7, 2017) ("A party may cure a material breach by 'engag[ing] in subsequent conduct that substantially performs or performs without a material failure.'" (quoting *Anacapa Tech., Inc. v. ADC Telecomms., Inc.*, 241 F. Supp. 2d 1016 (D. Minn. 2002))), *aff'd sub nom.*, *Spec's Fam. Partners, Ltd. v. First Data Merch. Servs. LLC*, 777 F. App'x 785 (6th Cir. 2019). And there are allegations that Plaintiffs breached first, meaning Plaintiffs may not be entitled to damages. *See McClain v. Kimbrough Constr. Co.*, 806 S.W.2d 194, 199 (Tenn. Ct. App. 1990) ("A party who has materially breached a contract is not entitled to damages stemming from the other party's later material breach of the same contract."). Plaintiffs have not addressed these defenses, which suggest that it may not be likely for Plaintiffs to succeed on this claim.

Plaintiffs did not submit any proof supporting their remaining claims.[4] The undersigned therefore finds that Plaintiffs have not shown a strong likelihood of success on the merits.

---

[4]     It is not clear to the undersigned whether Plaintiffs rely on Defendant AB's deduction of money to support their claims of professional negligence and violations of the Tennessee Real Estate Broker Act for Lodging Services and the Tennessee Real Estate Broker Act [*See* Doc. 14

## B. Irreparable Harm

Plaintiffs claim that without a preliminary injunction, they will sustain "irreparable injury that cannot be fully compensated by monetary damages" [Doc. 14 p. 16]. "If the Defendants are not enjoined from further accessing the Plaintiff[s'] trust accounts," Plaintiffs state that they "will likely continue to experience unauthorized withdrawals and misappropriation of funds" [*Id.* at 16–17]. Such actions, Plaintiffs assert, "will deplete [their] financial resources[,]" meaning that it "could lead to defaults on loan obligations and failure to make mortgage payments for the Properties" [*Id.* at 17]. Plaintiffs claim that "Defendants will interfere with the management of [their] properties" [*Id.*]. They contend that their "reputation in the rental market is also at risk" because "Defendants' mismanagement and potential neglect of the properties could result in negative reviews, canceled bookings, and a tarnished reputation" [*Id.*]. Such injuries, Plaintiffs argue, "cannot be quantified financially, and [the] effects could persist long after the immediate financial issues are resolved" [*Id.*]. "Moreover," Plaintiffs argue, they "face the very real possibility of losing control and access to their properties" [*Id.* at 18]. According to Plaintiffs, they "may be forced to take drastic and disruptive measures to regain control over their properties, such as changing locks or terminating contracts unilaterally, which could lead to further disputes, legal complications, and additional harm to the Plaintiff[s'] business relationships and reputation" [*Id.*].

Defendants respond that "[i]njunctive relief is not appropriate because Plaintiffs are not facing any imminent, actual threat of injury" [Doc. 21 p. 5]. "Plaintiffs' chief injury, the $77,549.28

---

pp. 13–16]. Regardless, Plaintiffs have not developed these arguments. *McPherson v. Kelsey*, 125 F.3d 989, 995 (6th Cir. 1997) ("'[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.'" (alteration in original) (quoting *Citizens Awareness Network, Inc. v. United States Nuclear Regulatory Comm'n,* 59 F.3d 284, 293–94 (1st Cir.1995))). And Defendants persuasively argue why Plaintiffs have not shown a strong likelihood of success on the merits of these claims at this time [*See, e.g.*, Doc. 21 p. 16 (explaining that there is no proof that Defendant AB withdrew the funds under "false pretenses")].

removed from the owner trust account," Defendants submit, "has already been returned to them" [*Id*. at 5]. Defendants have also sworn "that they will not remove any further funds" [*Id*.]. Defendants contend that "[t]he withdrawal of the trust account funds is remediable through the payment of money" [*Id*. at 6]. According to Defendants, "[w]hen the relief sought for a preliminary injunction is already provided, there is no live controversy that requires judicial intervention" [*Id*. at 9 (citations omitted)].

With respect to any "threat to Plaintiffs' business operations" due to "Defendants' control of the properties[,]" Defendants assert that "[t]he loss of business opportunities or future income is exactly the type of economic injury which is compensable by monetary damages" [*Id*. at 6]. According to the Declaration of Shawn Spiezio, "Between September 17, 2024[,] and January 1, 2025[,] these eleven . . . properties [at issue in this lawsuit] have a combined 86 pending reservations booked through [Defendant AB]" [Doc. 21-1 ¶ 12]. He states that Defendant AB has booked 352 nights through the end of 2024 and that "[t]he total revenue from these reservations exceeds $210,000" [*Id*.]. Defendants state that Plaintiffs' allegation "that their reputation in the rental market is 'at risk[,]'" is speculative [Doc. 21 p. 7]. Defendants deny that an injunction would maintain the status quo, but instead, argue that it would "prevent [them] from fulfilling their obligations and receiving compensation under the contracts at issue" [*Id*. at 10].

Plaintiffs reply that "[D]efendants so-called 'cure' does not negate the fact that a breach and theft of money occurred" [Doc. 22 p. 2]. This taking of money, Plaintiffs submit, "has destroyed any remaining trust [Plaintiffs have] in Defendants to act as their fiduciary and agent for the management of [its] properties" [*Id*.].

"A plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages." *Overstreet*, 305 F.3d at 578 (citation omitted); *see also*

*Towerco 2013, LLC v. Berlin Twp. Bd. of Trustees*, 110 F.4th 870, 889 (6th Cir. 2024) ("However, 'mere economic loss does not constitute irreparable injury,' because it is compensable by damages." (quoting *Ohio ex rel. Celebrezze v. Nuclear Regul. Comm'n*, 812 F.2d 288, 291 (6th Cir. 1987))). Here, Plaintiffs' primary harm is the alleged "unauthorized withdrawal and misappropriation of funds" [Doc. 14 pp. 16–18]. But this harm is economic, and Defendant AB has returned the money and declares "it will not take any further unilateral deductions" [Doc. 21-1 ¶ 15]. *See Wilburn v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, No. 2:23-CV-13170, 2024 WL 3488724, at *1 (E.D. Mich. July 18, 2024) (finding the plaintiff's motion for preliminary injunction moot because the defendant provided him with the relief sought); *D.P. Dough Franchising, LLC v. Southworth*, No. 2:15-CV-2635, 2017 WL 4315013, at *15 (S.D. Ohio Sept. 26, 2017) (finding there was no irreparable harm because the defendant ceased the infringing activity); *see also Montgomery v. Carr*, 848 F. Supp. 770, 779 (S.D. Ohio 1993) ("The term "status quo", however, must serve the primary purpose of preliminary injunction: to preserve the parties' relative positions in order to prevent irreparable injury prior to trial." (citation omitted)). The undersigned therefore finds Plaintiffs' request for a preliminary injunction related to the alleged unauthorized withdrawal without merit.

Plaintiffs also claim that Defendants will "interfere with the management of [their] properties," which "will result in physical deterioration of the properties, decreased marketability, and diminished rental income[,]" causing "disrupt[ion] to Plaintiff[s]' business operations" [Doc. 14 p. 17]. At the hearing, Plaintiffs noted that disruption to their businesses could cause them to default on their loans. But the loss of business opportunities or future income is an economic injury that can be compensable by monetary damages. *See S. Milk Sales, Inc. v. Martin*, 924 F.2d 98, 103 (6th Cir. 1991) (affirming the district court's decision not to enter a preliminary

injunction, noting that the district court found that "while [the plaintiff] may lose customers for its milk, there was no showing that the market was so limited that the damage would be irreparable"); *Tenn. v. Nat'l Collegiate Athletic Ass'n*, No. 3:24-CV-33, -- F. Supp.3d --, 2024 WL 464164, at *5 (E.D. Tenn. Feb. 6, 2024) (finding the plaintiffs' claim that they will receive less money does not constitute the irreparable harm required for a temporary restraining order);[5] *Mount Clemens Inv. Grp., L.L.C. v. Borman's Inc.*, No. 10-12679, 2010 WL 3998095, at *5 (E.D. Mich. Oct. 12, 2010) ("Since Plaintiff has not persuaded the Court that the Shopping Center is anything but an investment and that the Shopping Center is not so unique to call for a preliminary injunction, Plaintiff has not shown that the Shopping Center's loss would cause it an irreparable harm.").

Plaintiffs further claim that their "reputation in the rental market is also at risk" and that they "face the very real possibility of losing control and access to their properties" [Doc. 14 pp. 17–18]. Plaintiffs have not offered any evidence of these harms; therefore, they are speculative. *See Towerco 2013, LLC*, 110 F.4th at 888 ("This purported harm [of skepticism that it will not be a reliable partner] is far from 'certain and great,' as required for this second prong, but rather is more accurately described as 'speculative or theoretical.'" (quoting *Ohio ex rel. Celebrezze*, 812 F.2d at 290); *Thompson v. Hayes*, 748 F. Supp. 2d 824, 832 (E.D. Tenn. 2010) ("[The] plaintiffs' allegations of reputational harm are not supported by the record. Plaintiffs submitted no evidence to the Court demonstrating their reputation has been diminished by defendant's

---

[5]     In this case, the Court later granted an injunction because "a judgment in favor of [the p]laintiffs at the conclusion of this lawsuit will not make student-athletes whole." *Tenn. v. Nat'l Collegiate Athletic Ass'n*, No. 3:24-CV-33, 2024 WL 755528, at *5 (E.D. Tenn. Feb. 23, 2024). The Court reasoned that student athletes have a short time to negotiate his/her unique name, image, and likeness ("NIL") value and that this short window was when the student had "the most negotiating leverage with NIL collectives and the best chance to realize their true NIL value." *Id*. Such is not the case here where there is no evidence that "keeping the Defendants as property managers for [the] duration of the Management Agreements will . . . cause Plaintiffs to lose any negotiation leverage on a unique asset" [Doc. 21 p. 7 n.1].

21

actions[.]"). And Defendants have presented evidence that Defendant AB has continued to book reservations [Doc. 21-1 ¶ 12].

The undersigned therefore finds that Plaintiffs have not established that they will be irreparably harmed in absence of a preliminary injunction. Because of this finding, the undersigned need not consider the remaining factors.[6] *See Volkswagen Grp. of Am. Chattanooga Operations*, 2024 WL 718170, at *2 ("[T]he irreparable harm factor is 'dispositive,' eliminating the need for consideration of the other factors in its absence." (quoting *D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 327 (6th Cir. 2019)).[7]

---

[6]     With respect to the factor concerning harm to other persons, Defendants argue that terminating the Management Agreements places the existing reservations at risk [Doc. 21 p. 8]. They claim, "The failure to honor those reservations and/or the failure to perform all the necessary task to ensure the guests enjoy their stay will cause greater damage to both the Plaintiffs and [Defendant AB]" [*Id.*]. Plaintiffs reply that "these reservations can be seamlessly transferred to a new property management company[,]" which is a "standard practice" [Doc. 22 p. 5]. They state that "as the property owner[s], [they have] the exclusive right to cancel these bookings if necessary and at the discretion of the Plaintiff[s] as the property [owners]" [*Id.*]. To the extent Plaintiffs would cancel these bookings, this factor would weigh against entering an injunction. *Cf. Cellnet Commc'ns, Inc. v. New Par*, 291 F. Supp. 2d 565, 571 (E.D. Mich. 2003) ("It appears that no third party would be substantially harmed by the issuance of a preliminary injunction in this matter. If an injunction issued, cellular service to customers would continue and would be unaffected by the injunction.").

[7]     The undersigned does not need to address the Plaintiffs' request for a bond in light of the recommendation. *See Cellnet Commc'ns, Inc. v. New Par*, 291 F. Supp. 2d 565, 573 (E.D. Mich. 2003) ("As the Court will deny the motion for a preliminary injunction, the Court does not need to address the issue of a security pursuant to Rule 65 of the Federal Rules of Civil Procedure.").

## IV.   CONCLUSION

For the reasons explained above, the undersigned **RECOMMENDS**[8] that the District Judge **DENY** Plaintiffs' Motion for Declaratory Judgment and Preliminary Injunction and/or Temporary Restraining Order [**Doc. 12**].

Respectfully submitted,

Jill E. McCook
United States Magistrate Judge

---

[8]     Any objections to this Report and Recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Civ. P. 72(b)(2). Such objections must conform to the requirements of Federal Rule of Civil Procedure 72(b). Failure to file objections within the time specified waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140, 153-54 (1985). "[T]he district court need not provide *de novo* review where objections [to the Report and Recommendation] are '[f]rivolous, conclusive or general.'" *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986) (quoting *Nettles v. Wainwright*, 677 F.2d 404, 410 n.8 (5th Cir.1982)). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed. of Tchrs.*, 829 F.2d 1370, 1373 (6th Cir. 1987).

23